**Nathan G. Wagner**
**Jenna P. Lyons**
WAGNER & LYONS, PLLC
1821 South Avenue West, Suite 501
Missoula, Montana 59801
Telephone:  406-226-2552
Facsimile:   406-226-2553
E-Mail:       nate@swl.legal; jenna@swl.legal; mail@swl.legal

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| ESTATE OF DANIEL KEITH ROSS, | Cause No. __CV-22-26-BU-BMM-JTJ_____ |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| GALLATIN COUNTY, and JOHN DOES 1-10, | |
| Defendants. | |

Plaintiff Estate of Ross, by and through Personal Representative Mary Poucher, submits the following complaint and demand for trial by jury:

## JURISDICTION AND VENUE

1.     This is an action for violation of constitutional rights under color of law, negligence, and other wrongful acts under both federal law and state law.  This action is brought under 42 U.S.C. § 1983 and 42 U.S.C. § 1988; the Montana Constitution including but not limited to Article II, Sections 4, 17, and 22; the United

States Constitution including but not limited to the Eighth and Fourteenth Amendments, and Mont. Code Ann. §§ 27- 1-501 and 27-1-513.

2.      Jurisdiction and venue are proper in this Court because the acts and omissions alleged herein occurred in Bozeman, Gallatin County, Montana, which is part of the Butte Division of the District of Montana.

## PARTIES

3.      The Plaintiff is the Estate of Daniel Keith Ross, by and through the Personal Representative Mary Poucher, who seeks an award of damages on behalf of the Estate and on behalf of the decedent's daughter K.R., a minor, who is the decedent's only heir.

4.      Defendant Gallatin County is a political subdivision of the State of Montana and is responsible for events that occur at the Gallatin County Detention Center ("GCDC"), and is the employer of John Does 1-10 who may be responsible for some of the acts or omissions alleged herein.

5.      Defendants John Does 1-10 are individual employees of the Gallatin County Detention Center, Gallatin County, or other entities who may be responsible for some of the acts or omissions alleged herein.

## ALLEGATIONS COMMON TO ALL COUNTS

6.      According to data released by Gallatin County, there are around six serious suicide attempts inside GCDC every year.

7.     In 2013, a GCDC inmate attempted to hang himself with bedsheets but was rescued by GCDC staff.

8.     In July of 2018, inmate Rodolfo Millan-Calderon committed suicide inside GCDC.

9.     The crises of jail suicides has been well-publicized throughout the United States.  In 2010, the National Center on Institutions and Alternatives published an article entitled "National Study of Jail Suicides – 20 Years Later" which put the Defendants on notice that:

    a.  Suicide was the leading cause of death in jails across the United States, which constituted a national health crisis;

    b.  Suicide by hanging with bedding materials was the most common method used by victims of suicide;

    c.  The majority of suicides occurred when inmates were in isolation or alone;

    d.  Anchoring devices such as clothing hooks, bed frames, door knobs, shower knobs, sinks, ventilation grates, windows, and smoke detectors, or other such protrusions were the most common means for suicide by hanging;

e.  Preventing jail suicides requires safe housing in cells that free of protrusions from which bedding or other materials can be anchored in order to commit suicide;

f.  Suicide assessments should be done on a daily basis for those detainees who have a known risk for suicide;

g.  Detainees with a known risk for suicide should be closely monitored or supervised.

10.   In 2017, the Montana Department of Public Health and Human Services published the "Montana Strategic Suicide Prevention Plan—2017" which advised that correctional facilities such as GCDC should implement the following in order to prevent jail suicides:

a.  Facilities should have written policies and procedures for both preventing suicides and responding to attempts that may occur;

b.  All staff at the facilities should be trained on when and how to implement suicide prevention plans;

c.  Facilities should have a suicide prevention plans that should include protocols for assessing suicide risk and imminent suicide risk, which should include a formal intake suicide risk and mental health assessment at the time a detainee is first admitted into the facility, but because an inmate's risk status can change dramatically over time, staff

need to be trained to recognize and respond to changes in an inmate's mental condition;

d. Facilities should a process to ensure effective communication about suicide risk, because knowledge about an inmate's risk status and history can be lost as he or she is transferred between units or facilities (or as shifts change).  As a result, formal procedures for communicating knowledge about suicide risk of particular inmates will help staff maintain and target their vigilance.  Information that needs to "follow" the prisoner includes the following: ¨ suicide threats by the inmate ¨ behaviors that indicate he or she may be depressed ¨ a history of psychiatric care and medication ¨ whether the inmate is in protective custody;

e. Facilities should be aware of risks associated with use of isolation cells, because while is it often appropriate for prisoners to be placed in isolation cells, this placement can raise the risk of suicide.  If an inmate thought to be at risk of suicide requires isolation, attention must be paid to appropriate observation of the inmate as well as ensuring that all isolation cells are suicide resistant – that is, minimize the presence of items that could be used for self-harm, such as bed sheets and

projections from walls or furniture that could be used as anchors for a hanging;

f.  Staff should be trained in recognizing and responding to suicide risk, and in first aid (including CPR) as well as the need to begin procedures such as CPR immediately;

g.  Facilities should ensure the availability of equipment including latex gloves, resuscitation breathing masks, defibrillators, and tools for opening jammed cell doors and cutting down a hanging inmate;

11.   According to the Montana Strategic Suicide Prevention Plan—2017, the following intervention guidelines are the most effective way to prevent suicides:

a.  Verbal warnings. People who are considering killing themselves often talk about their plans. Staff should pay attention to similar thoughts or statements expressed in letters, poems, or other writings that may come to their attention.

b.  Depression. Although most people suffering from clinical depression do not kill themselves, a significant proportion of people who die by suicide are clinically depressed.

c.  Psychosis. Any signs of psychosis, such as talking to oneself, claiming to hear voices, or suffering hallucinations, should also be taken as a sign that the prisoner may be at risk. Staff should be especially alert if

prisoners have stopped taking anti-psychotic or anti-depressive medication.

d. Reaction to incarceration. Many suicides in jails occur during the first 2 weeks of detention. Many occur when an inmate is under the effect of alcohol or drugs. Young adults arrested for nonviolent offenses – such as alcohol or drugs - are often at elevated risk of suicide. They can be afraid of jail, embarrassed by their situation, and afraid of reaction of their family and friends to their arrest.

e. Current precipitating events. In addition to arrest and detention, there are other events that can precipitate a suicide attempt, including receiving bad news from home, conflict with other inmates, legal setbacks, withdrawal from drugs, and the tension caused by court hearings or sentencing, or sexual coercion. 80% of inmates who committed suicide attended a court hearing within 2 days of their death.

f. Recognizing and Responding to the Warning Signs. Correctional personnel should not be afraid to ask an inmate if he or she has considered suicide or other self-destructive acts. Asking someone if he or she has thought about suicide will NOT increase the risk of suicide. Correctional staff may want to be very direct and simply ask the question "Are you thinking about killing yourself?" It is very possible

Complaint and Demand for Jury Trial                                            7

that an honest answer will not be forthcoming, given the tension that can exist between inmates and correctional staff and the unwillingness of prisoners to "open up" about issues that they may consider to be signs of weakness. Any suspicion that a prisoner may be actively at risk of suicide should be communicated to a mental health professional. Any suspicion that a prisoner may be in imminent danger should be reported. Reports of such suspicions by inmates' families or other inmates should also be taken seriously. Some prisoners use the threat of suicide (or a "feigned" suicide attempt) to manipulate the system and, for example, delay a court date or obtain a transfer to another unit or facility. It is extremely difficult to tell whether an inmate is feigning suicide risk. Thus, all suicide threats must be taken seriously.

12.    On or around March 5, 2019, Ross was taken into custody and booked into the GCDC for a non-violent probation violation arising from a positive test for a banned substance.

13.    While being held inside the GCDC, Ross made a phone call to his ex-wife Poucher which was monitored by GCDC staff.  During this call, Ross stated that he intended to commit suicide by hanging himself with bed sheets inside his cell.

14.    Ross also wrote a letter to Poucher, which was reviewed by GCDC staff, in which Ross again expressed the intend to kill himself while incarcerated at GCDC.

15.     Gallatin County, GCDC employees, and other Doe Defendants knew or reasonably should have known that Ross was at a substantial risk of suicide based on his legal problems, recent incarceration, history of substance abuse, isolation from his family, and recently verbalized intention to commit suicide inside GCDC.

16.     On or around March 13, 2019, in response to Ross's stated intention to commit suicide, GCDC staff performed a suicide risk assessment on Ross.

17.     Gallatin County, GCDC employees, and other Doe Defendants failed to place Ross on suicide watch or close supervision, thereby placing him at an increased risk for serious injury or death.

18.     Following the suicide risk assessment, and despite GCDC's knowledge that Ross was suicidal, Ross was left unsupervised.

19.     Ross was found hanged and nonresponsive on March 13, 2019.

20.     Ross was transported to the hospital where he survived until April 4, 2019, when he passed away.  Ross was conscious and aware of his condition during some of the time between March 13, 2019 and April 4, 2019.

## COUNT I—42 USC § 1983—DOE DEFENDANTS

21.     The Plaintiff alleges the preceding paragraphs.

22.     The Doe Defendants are individual officers or other employees of GCDC, Gallatin County, or other entities whose acts or omissions deprived Ross of constitutional rights protected by the Eighth Amendment and Fourteenth

Amendment to the United States Constitution, including the right to be free from cruel and unusual punishment, and to be afforded due process.

23.    The Eighth Amendment requires Gallatin County, GCDC staff, and the Doe Defendants to ensure that Ross received adequate medical and mental health care, and that reasonable steps be taken to guarantee Ross's safety.

24.    The Doe Defendants acted with deliberate indifference or reckless disregard for Ross's safety in light of the known risk that his mental condition was such that he was contemplating taking his own life.

25.    The Doe Defendants' deprivation of Ross's rights exposed Ross to a substantial risk of serious harm.

26.    The Doe Defendants' exhibited deliberate indifference to Ross's risk of harm because the Doe Defendants knew Ross faced a substantial risk of serious bodily harm or death by suicide, and disregarded that risk by failing to take reasonable measures to abate the risk.

27.    The Doe Defendants' actions and omissions were the cause of Ross's suffering and eventual death by suicide.

28.    The Doe Defendants' actions and omissions are actionable under 42 U.S.C. § 1983, which allows an award of compensatory damages, punitive damages, and attorney's fees.

29.    The Doe Defendants' actions and omissions were all done in the course and scope of their employment by Gallatin County.

30.    Gallatin County is liable for any non-criminal conduct of its employees which takes place during the course and scope of their employment.

**COUNT II—NEGLIGENCE—GALLATIN COUNTY and DOE DEFENDANTS**

31.    The Plaintiff alleges the preceding paragraphs.

32.    Each of the Defendants owed Ross a duty to act with reasonable care to avoid foreseeable risks of death or injuries.

33.    Each of the Defendants were obligated to exercise reasonable care to prevent Ross from carrying out his stated intention to commit suicide, including the duty to monitor or supervise Ross to prevent him from committing suicide, the duty to detain and house Ross in a manner that did not give him access to materials with which he could commit suicide, the duty to design build and maintain GCDC in a manner that would prevent Ross from using available materials to commit suicide, the duty to provide timely and appropriate mental health care to Ross to prevent him from committing suicide, and the duty to provide timely and appropriate medical care following Ross's suicide attempt so as to minimize the injuries he suffered.

34.    The Defendants breached the duties set forth above.

35.    The Defendants' breach of their duties caused injuries, death, and other damages to Ross in an amount to be determined at trial.

36.     The Defendants' acts and omissions as alleged herein were done with reckless disregard for the high risk of harm to Ross so as to render the Defendants liable for an award of punitive damages under Mont. Code Ann. § 27-1-221.

## COUNT III--*MONELL* CLAIM--GALLATIN COUNTY

37.     The Plaintiff alleges the preceding paragraphs.

38.     Gallatin County failed to adopt policies for the prevention on detainee suicides, failed to implement the policies through proper training/supervision to prevent detainee suicides, or failed to provide proper equipment/furnishings to allow its policies to be implemented so as to avoid the risk of detainee suicides.

39.     Gallatin County's failures amount to deliberate indifference toward the risk of detainee's death by suicide.

40.     Gallatin County's failure to adopt policies, train/supervise its employees, or provide proper equipment/furnishings render Gallatin County liable under the holding of *Monell* for violations of Ross's constitutional rights.

41.     Gallatin County is liable under 42 U.S.C. § 1983 for the damages arising from Ross's death by suicide as set forth above.

## COUNT IV--WRONGFUL DEATH and SURVIVORSHIP
## ALL DEFENDANTS

42.     The Plaintiff alleges the preceding paragraphs.

43.     Under Montana law, the Plaintiff is authorized to pursue claims for damages for wrongful death and survivorship under Mont. Code Ann. § 27-1-501 and § 27-

1-513.  These claims must be brought by the personal representative of the Estate of the decedent, and the elements of damages may be recovered only once.

44.    Ross survived the initial suicide attempt and lived long enough to experience pain, suffering, fear, anxiety, and emotional distress.

45.    Ross suffered economic damages in the form the wages he would have earned during his life expectancy.

46.    Ross's daughter and sole heir K.R. was deprived of the society, companionship, support, care, aid and protection she would have received from Ross had he not died.

47.    Ross's daughter and sole heir K.R. suffered grief, sorrow, and mental anguish as a result of Ross's death.

48.    The Defendants are liable for wrongful death and survivorship damages in an amount to be determined at trial.

WHEREFORE, the Plaintiff requests the following relief:

A.    An award of ompensatory damages in an amount to be proven at trial;

B.    An award of punitive damages in an amount to be proven at trial;

C.    An award of attorney's fees and costs in an amount to be proven at trial; and

D.    Such further relief as the Court may deem just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

The Plaintiff demands trial by jury on all issues appropriate to be tried before a jury.

DATED this 1st day of April, 2022.

WAGNER & LYONS, PLLC

By:  /s/ Nathan G. Wagner
     Nathan G. Wagner
     Jenna P. Lyons
     *Attorneys for Defendants*